Filed 1/28/21  In re J.C. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re J.C., a Person Coming Under the Juvenile Court Law. | B301596 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DAVID C.,<br><br>    Defendant and Appellant. | (Los Angeles County  Super. Ct. No.  17LJJP00091A) |

APPEAL from an order of the Superior Court of Los Angeles County, Stephanie M. Davis, Juvenile Court Referee. Affirmed.

Keiter Appellate Law and Mitchell Keiter for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kim Nemoy, Acting Assistant County Counsel, Navid Nakhjavani, Principal Deputy County Counsel, for Plaintiff and Respondent.

————————————

David C., the father of six-year-old Josiah C., appeals from the juvenile court's order terminating his parental rights under Welfare and Institutions Code section 366.26.[1] David contends the juvenile court abused its discretion in denying his requests for a continuance of the section 366.26 hearing and for a contested hearing on the parent-child relationship exception to the termination of parental rights. David also contends the Los Angeles County Department of Children and Family Services (Department) failed to comply with the inquiry requirements of the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA) as it applies to Josiah's mother, Karina R. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Dependency Proceedings*

1. *Original Petition*

On October 4, 2017, the Department filed a petition on behalf of then three-year-old Josiah under section 300, subdivision (b). In count b-1, the Department alleged that Karina "has an extensive history of illicit drug abuse, including amphetamine, and [was] a current abuser of methamphetamine and heroin, which render [Karina] incapable of providing regular care and supervision of [Josiah]." The Department further alleged that Josiah "was a prior dependent of the Juvenile Court due to [Karina's] illicit drug use and that the juvenile court had declared Josiah's four siblings dependents of the Juvenile Court and received permanent placement services due to [Karina's] illicit drug abuse." In count b-2, the Department alleged that

---

[1] Undesignated statutory references are to Welfare and Institutions Code.

David "has a history of substance abuse, including marijuana and alcohol, and is a current abuser of alcohol, which renders [David] incapable of providing regular care and supervision for [Josiah]." The Department also alleged that two of Josiah's siblings "received permanent placement services due to [David's] substance abuse." In count b-3, the Department alleged that Karina "left [Josiah] in the care of paternal grandmother, Maria [C.], without making an appropriate plan for [Josiah's] ongoing care and supervision, including [Josiah's] medical care. [Karina] previously left [Josiah] with the paternal grandmother without maintaining contact with the paternal grandmother and without returning to resume care of [Josiah]." The Department alleged the parent's actions endangered Josiah's physical health and safety and placed Josiah "at risk of serious physical harm, damage, and danger."

At the detention hearing on October 5, 2017, the juvenile court found a prima facie case for detaining and finding that Josiah was a person described by section 300. The juvenile court detained Josiah from David and Karina and placed Josiah with his paternal grandmother Maria, with whom Josiah had been living. Karina and David did not attend the hearing. Karina's whereabouts were unknown, and David was incarcerated. The juvenile court ordered the Department to conduct a due diligence search regarding Karina. The juvenile court continued the hearing so that David could attend. The juvenile court deferred making any findings pursuant to ICWA. At the continued hearing on October 17, 2017, David denied the allegations in the petition and confirmed he did not have Indian ancestry. The juvenile court found ICWA did not apply as to David. The juvenile court deferred making an ICWA finding as to Karina

3

because her whereabouts remained unknown.  The juvenile court scheduled the jurisdiction hearing for November 28, 2017.

### 2. *Prior Dependency Proceedings*

The Department's reports chronicled Karina's and David's history of prior dependency proceedings.  In October 2015, based on Karina's use of illicit drugs during her pregnancy with Josiah and David's history of domestic violence, the juvenile court declared Josiah a dependent of the court.  During this prior proceeding, David failed to maintain contact with the Department, while Karina made progress on her case plan.  In October 2015, the juvenile court terminated jurisdiction over Josiah with a section 362.4 custody order granting Karina sole legal and physical custody of Josiah and David monitored visitation.

Between 2009 and 2012, the juvenile court sustained multiple dependency petitions on behalf of Josiah's four siblings based on David's and Karina's illicit drug use, emotional abuse, general neglect and physical violence.  Although the Department provided family reunification services, including programs for drug rehabilitation and parenting education and individual counseling to address domestic violence, Karina and David failed to reunify with the children.  After Karina waived her rights for reunification services regarding one of the four siblings,[2] the juvenile court granted legal guardianship of that sibling to the maternal grandmother and terminated jurisdiction over that sibling in April 2010.  During the period April 2012 to April 2015,

---

[2]     David is not the father of this sibling, but David was identified as Karina's "male companion" in the sustained petitions.  David is the father of the other three siblings.

4

the juvenile court terminated David's and Karina's parental rights to the three other siblings, and Cristal C., a paternal aunt, and her husband Emmanuel R. adopted Josiah's three siblings.

### 3. *Amended Petition*

On November 27, 2017, the Department filed an amended petition, adding an additional count under section 300, subdivision (b), and a count under subdivision (j). In these counts, the Department alleged that David "has a history of engaging in violent altercations." In the presence of Josiah's siblings, David "physically attacked [Karina]" on different occasions. In part because of David's "unresolved history of engaging in violent altercations," the juvenile court ordered permanent placement services for Josiah's siblings. The Department further alleged that, in November 2015, based on his convictions for causing an elder to suffer unjustified physical pain (Penal Code, § 368, subd. (c)), the criminal court issued a 10-year restraining order against David protecting Maria and paternal grandfather Raymond C. On July 24, 2017, the criminal court found David in contempt of court for willfully and knowingly violating the restraining order. (Pen. Code, § 166, subd. (c)(1).) The Department alleged David's "history of unresolved violence and [Karina's] failure to protect" endangered Josiah. According to the Department, despite the juvenile court's custody order under section 362.4 granting Karina sole legal and physical custody of Josiah and ordering monitored visitation for David, Karina allowed David to have unmonitored visits with Josiah.

### B. *Jurisdiction Hearing*

At the jurisdiction hearing on November 28, 2017, the juvenile court dismissed the original petition and deemed filed

5

the amended petition. The juvenile court ordered the Department to provide David with a written schedule for monitored visits. The juvenile court continued the jurisdiction hearing to February 8, 2018. On November 28, 2017, David signed an agreement in which he agreed to visit Josiah every Friday from 10:00 a.m. to 12:00 noon, with a Department approved monitor present.

From November 28, 2017 to the continued jurisdiction hearing on February 8, 2018, David did not visit Josiah. David told the Department that he could not visit Josiah "because of his work schedule." David also told the Department that "he has not begun any classes or programs, but does have old certificates from 2015-2016 that he completed." David "also mentioned he was attending AA classes." The Department reported that Karina's whereabouts were unknown. According to Maria, "the last thing she knows in regards to [Karina] is [she was] in jail about three times."

At the jurisdiction hearing on February 8, 2018, the juvenile court sustained all counts in the amended petition pursuant to section 300, subdivisions (b) and (j), and declared Josiah a dependent of the juvenile court. The juvenile court ordered the Department to submit a report regarding its due diligence search for Karina. The juvenile court also ordered Josiah to remain placed with Maria under the Department's supervision. The juvenile court scheduled the disposition hearing for March 22, 2018. After several continuances, the juvenile court scheduled the disposition hearing for July 30, 2018.

C. *Disposition Hearing*

1. *February 2018 - July 2018*

On February 26, 2018, David signed an agreement stating

6

that he would visit Josiah every Monday from 9:00 a.m. to 11:00 a.m. at the Department's Palmdale office.  According to the Department, from February 2018 through June 2018, David visited Josiah on three occasions:  February 26, April 30, and May 8, 2018.  David canceled four visits and, on 12 occasions, David did not show up for the visit and failed to cancel the visit.  David told the Department that "he has been really busy working" and that "sometimes doesn't have enough money to see [Josiah]."  When David visited with Josiah, the Department observed that Josiah was excited to see [David], stating, "I love my dad."  David and Josiah were affectionate and played together appropriately.

In April 2018, David provided the Department with a certificate of completion for anger management classes dated December 2014 and a "Progress Letter" for "domestic violence/anger management" classes.  The most recent information showed that David started a domestic violence program on February 2, 2018 and that he completed 10 out of 52 classes.  In July 2018, David advised the Department that he would provide a certificate of completion once he completed the program, but he did not provide such a certificate.  After the Department asked David when he was available to visit Josiah on July 11, 2018, David visited Josiah on July 12, 2018.  David apologized for not staying in contact with the Department.

In accordance with section 361.5, subdivisions (10), (11), and (13), the Department recommended that the juvenile court not order reunification services for David or Karina and that the juvenile court schedule a selection and implementation hearing under section 366.26.

## 2.    *July 30, 2018 Hearing*

At the disposition hearing on July 30, 2018, Josiah's counsel submitted on the Department's recommendation, adding: "Both Parents in this case have previously failed to reunify with other siblings and they went into permanent plans. [David], although he mentions some progress in domestic violence and some progress in parenting class, it doesn't really seem like he's made much further progress. . . . [David's] visitation with Josiah is also not consistent. . . . On quite a few of those visits [David] was a no-show or he cancelled the visit. Based on that, I am requesting that the court not offer reunification services and set a [section 366].26 hearing for Josiah." The juvenile court denied family reunification services to Karina and David under section 361.5, subdivisions (b)(10), (11), and (13). In addition, because Karina's whereabouts remained unknown, the juvenile court also denied reunification services for Karina under section 361.5, subdivision (b)(1).

The juvenile court found: "The few times when [David] has visited Josiah, they appear to be well bonded. [Josiah] has been elated to see [David] and he is appropriate with [Josiah]. The court does note that [David] works a lot of hours; that he's only had about three visits since February 7 of this year and he has been unable to keep in touch with the social worker. [David has] been able to make progress on programs. The court notes . . . [David] had completed 10 of 52 domestic violence classes; however, it doesn't appear that he has made sufficient progress to demonstrate to the court that he's committed to reunifying, so the court is ordering [no reunification services] to [David]." The juvenile court ordered David's monitored visits with Josiah to continue. David did not attend the hearing. The juvenile court

8

set the selection and implementation hearing (§ 366.26) for November 27, 2018.

> D. *Selection and Implementation Hearing*
>
> > 1. *August 2018 - October 2019*

In December 2018, Karina contacted the Department and stated that she wanted to visit Josiah. On December 21, 2018, representing herself, Karina filed a section 388 petition, stating, "I'm not perfect but I would like to be reunited with [Josiah]." The juvenile court, without holding a hearing, denied Karina's petition on January 2, 2019 because "the request does not state new evidence or a change of circumstances." The section 388 petition was Karina's only filing in the juvenile court.

Maria told the Department that she was not interested in adopting Josiah. In violation of the restraining order, Maria allowed David in her home "early in the morning and other times." Although the Department reported that David had "access to Josiah" in Maria's home, the report did not provide any specific information. Cristal and Emmanuel, who had adopted Josiah's three siblings, were committed to providing Josiah with a permanent home through adoption. They were "motivated to adopt [Josiah] to keep the siblings together." The Department requested that the juvenile court vacate the existing "do not remove order" for Josiah's placement with Maria so that the Department could place Josiah with Cristal and Emmanuel. On February 1, 2019, the Department removed Josiah from Maria's home and placed him with Cristal and Emmanuel. After the juvenile court ordered notice by publication for Karina, the Department published notice of the section 366.26 hearing.

## 2. *October 17, 2019 Hearing*

After several continuances to allow the Department to conduct further due diligence regarding Karina and perform permanency planning, the juvenile court held the selection and implementation hearing on October 17, 2019. David's counsel made an oral request to continue the hearing. Counsel stated: "[David] has, in the last few moments, advised me and presented me with various certificates of completion for programs. I'm asking for a continuance to discuss the viability of a 388 with [David]. I'm just receiving this information within the last five minutes. If the court proceeds today, it would be over my objection." After the Department's counsel and Josiah's counsel objected to the continuance request, the juvenile court denied David's request for a continuance because of the absence of good cause.

David's counsel then requested a contested hearing. In response to the juvenile court's request for an offer of proof, David's counsel stated, "The fact that since being released [from jail], [David] advised me that . . . he has certificates of completion. He has completed a parenting program. He's also made substantial progress in the domestic violence program. He indicates to me that the care-taker's not allowed him to have visits. . . . He does believe it would be in [Josiah's] best interest to grant [David] a contested hearing to show that it would be in [Josiah's] best interests to not sever his parental bond with [Josiah]." Josiah's counsel responded that David "has not been visiting" Josiah and that David, "if he wanted to have visits, he could have contacted the social worker." The juvenile court denied the request for a contested section 366.26 because David's offer of proof did "not meet the necessary criteria" and failed to

10

discuss the "specific issues" to be addressed at the selection and implementation hearing.

After finding that continued jurisdiction over Josiah was necessary because the "conditions continue[d] to exist which justified jurisdiction under section 300, the juvenile court found by clear and convincing evidence that Josiah was adoptable. Finding that no exception to adoption applied and that it would be detrimental for Josiah to be returned to his parents, the juvenile court terminated the parental rights of David and Karina. The juvenile court transferred Josiah's care, custody, and control to the Department for adoption planning and placement. The juvenile court designated Cristal and Emmanuel as the prospective adoptive parents and ordered adoption as the permanent plan.

E.    *Karina's Possible Indian Ancestry*

The Department's efforts to locate Karina were unsuccessful. In declarations of due diligence filed on November 17, 2017, March 19, 2018, March 20, 2019, and July 3, 2019, the Department summarized its efforts to locate Karina. During the period November 2017 through April 2019, the Department searched government agency databases, including military, prison (state and federal), probation/parole, voter registration, postal service, child support, motor vehicle, and welfare databases. The Department also conducted internet and social media searches. Based on its investigation, on multiple occasions, the Department sent Karina various court documents via certified mail to at least 15 different street addresses. The Department also repeatedly called at least nine different phone numbers and sent communications to several email addresses. Although Karina provided a mailing address and phone number

on her section 388 petition in December 2018, the Department was unable to contact her using that information.

In reviewing the court files from the prior dependency proceedings, the Department located a court document from August 2013 that indicated "[Karina] may have Navajo [ancestry]." However, according to the court records, when the court ordered the adoptions of Josiah's three siblings, the juvenile court found that ICWA did not apply. During these proceedings, Karina also "denied" any Indian ancestry.

The Department interviewed paternal family members David, Maria and Cristal. David stated that Karina did not have Indian ancestry and that he "didn't know" any information about Karina's relatives. While Maria stated Karina's children "may have" Indian ancestry, she had "no further information." Maria stated there was no Indian ancestry within her family. Cristal stated that "she is not a blood relation of [Karina]" and that she did not have any "information as to Indian [ancestry] for [Karina]." The Department attempted to contact Karina's parents. However, the Department was unsuccessful because it could not obtain current contact information for them. The Department's investigation did not identify any other relatives for Karina. On the ICWA-030 form, for Karina's parents and Karina under "Tribe or band," the Department stated: "Navajo; Unknown Location," and for their "Tribal membership," the Department stated: "Unknown." The Department listed the full names for Karina's parents, their dates of birth, and last known addresses.

On February 28, 2018, the Department sent via certified mail the ICWA-030 form to, and in March 2018 received certified mail receipts from, David; the Secretary of the Interior; the

12

Western Regional Director, Bureau of Indian Affairs; the Southwest Regional Director, Bureau of Indian Affairs; the Navajo Region, Bureau of Indian Affairs; the Navajo Nation; the Colorado River Indian Tribes; and the Ramah Navajo Tribe. The Navajo tribes, the Bureau of Indian Affairs, and the Secretary of the Interior did not provide further information regarding Karina's possible Indian ancestry or whether Josiah was an Indian child. The Ramah Navajo Tribe stated they did not have "access to the entire Navajo Nation Census records and therefore [could] not confirm or deny" if Josiah or his parents were "enrolled or eligible members of the Navajo Nation." The Ramah Navajo Tribe stated that it would forward the notice to the "Navajo Nation ICWA Office." In a letter dated March 5, 2018, the Bureau of Indian Affairs, Navajo Regional Office stated, "The Notice(s) indicate[ ] that you have properly notified the Navajo Nation. Each tribe is responsible for determining whom they enroll." (Boldface omitted.) In a letter dated March 14, 2018, the Bureau of Indian Affairs, Western Regional Office advised, "The Department notified the Navajo Tribes/Nation; therefore, no action or response is required." (Boldface and underscoring omitted.) In a letter dated March 15, 2018, the Bureau of Indian Affairs, Southwest Regional office stated: "Information indicates that the child's tribal affiliation may be Navajo. The Notice indicates that the Navajo Nation and two affiliated tribes were notified. Enclosed is contact information for tribes affiliated with the Navajo Nation. The Bureau of Indian Affairs does not research or determine tribal enrollment for tribes. No action is taken."

After the Department filed all pertinent information at a May 24, 2018 hearing, the juvenile court found that it "does not

13

have a reason to know that [Josiah] is an Indian Child, as defined under ICWA, and does not order notice to any tribe or the [Bureau of Indian Affairs]. Parents are to keep the Department, their Attorney and the Court aware of any new information relating to possible ICWA status. ICWA-020, the Parental Notification of Indian Status is signed and filed."[3]

## DISCUSSION

A. *The Juvenile Court Did Not Abuse Its Discretion in Denying David's Request To Continue the Hearing*

1. *Applicable Law and Standard of Review*

The juvenile court has the power to "control all proceedings during the hearings with a view to the expeditious and effective ascertainment of the jurisdictional facts and the ascertainment of all information relative to the present condition and future welfare of the person upon whose behalf the petition is brought." (§ 350, subd. (a)(1); see *In re Emily D.* (2015) 234 Cal.App.4th 438, 448.) As a general matter, "[c]ontinuances are discouraged in dependency cases." (*In re Giovanni F.* (2010) 184 Cal.App.4th 594, 604; accord, *In re Elijah V.* (2005) 127 Cal.App.4th 576, 585.) "[T]he juvenile court has authority to grant brief, necessary continuances that are not inconsistent with the child's best interests, while giving 'substantial weight to a minor's need for prompt resolution of his or her custody status, the need to

---

[3] The Department's reports stated that July 30, 2018 was the date on which the juvenile court found that ICWA did not apply. However, the July 30, 2018 hearing transcript and minute order did not mention ICWA. A copy of the ICWA-020 form referenced in the May 24, 2018 minute order is not part of the record. An ICWA-020 form as to David, signed by David and filed on October 12, 2017, is part of the record.

provide children with stable environments, and the damage to a minor of prolonged temporary placements.'" (*In re Abbigail A.* (2016) 1 Cal.5th 83, 95; see § 352, subd. (a)(2) ["[c]ontinuances shall be granted only upon a showing of good cause and only for that period of time shown to be necessary by the evidence presented at the hearing on the motion for the continuance"]; Cal. Rules of Court, rule 5.550(a)(4) ["[i]n order to obtain a continuance, written notice with supporting documents must be filed and served on all parties at least two court days before the date set for hearing, unless the court finds good cause for hearing an oral motion"].)

"We review the juvenile court's denial of a continuance for abuse of discretion." (*In re D.Y.* (2018) 26 Cal.App.5th 1044, 1056; accord, *In re Giovanni F., supra*, 184 Cal.App.4th 594; *In re Elijah V., supra*, 127 Cal.App.4th at p. 585; *In re A.B.* (2014) 225 Cal.App.4th 1358, 1366.)

### 2. *The Juvenile Court Did Not Abuse Its Discretion*

David argues that the juvenile court erred in denying his request to continue the section 366.26 hearing so he could "consider the possibility of filing a section 388 petition." David further argues, "If [he] had evidence that could support a section 388 petition, a comparable continuance would not have been contrary to Josiah's interest."

The juvenile court did not abuse its discretion in denying David's request for a continuance. David had more than sufficient opportunity to bring to the juvenile court's attention any information bearing on his ability to parent Josiah. After the Department filed the petition in October 2017, and the court denied David and Karina reunification services in July 2018, the

15

juvenile court set the section 366.26 hearing for November 2018. After several continuances, the section 366.26 hearing took place in October 2019, almost one year later. Despite the passage of almost two years since the Department filed the petition, David only raised the "possibility" of filing a section 388 petition at the section 366.26 hearing. David did not explain why he waited until moments before the hearing to discuss a section 388 petition with his counsel. In support of the continuance request, David also failed to state that he was going to file a section 388 petition, that he had sufficient evidence to support such a petition, or that a continuance was consistent with Josiah's best interests. David's possible section 388 petition failed to qualify as good cause necessary for a continuance.[4]

Under these circumstances, the juvenile court acted well within its discretion in denying David's request for a continuance of the selection and implementation hearing.

B. *The Juvenile Court Did Not Abuse Its Discretion in Denying David a Contested Hearing*

1. *Applicable Law and Standard of Review*

"The section 366.26 hearing is a critical late stage in a dependency proceeding. The child has been under juvenile court jurisdiction for an extended period following the dispositional order, and the court has held one or more review hearings to consider a return to parental custody. [Citation.] At the section 366.26 hearing, the focus shifts away from family reunification and toward the selection and implementation of a permanent

---

[4] David contends he requested a three-day continuance. However, according to the hearing transcript, David's counsel did not specify a length of time for the continuance.

16

plan for the child.  [Citation.] . . . If adoption is likely, the court is required to terminate parental rights, unless specified circumstances compel a finding that termination would be detrimental to the child."  (*In re S.B.* (2009) 46 Cal.4th 529, 532; see *In re Noah G.* (2016) 247 Cal.App.4th 1292, 1299 ["'[w]henever the court finds "that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption."'"].)

"One exception to adoption is the beneficial parental relationship exception.  This exception is set forth in section 366.26, subdivision (c)(1)(B)(i) which states:  '[T]he court shall terminate parental rights unless either of the following applies: . . . . [¶] (B)  The court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances:  [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.'"  (*In re Noah G., supra*, 247 Cal.App.4th at p. 1300.)  "Application of the beneficial parent-child relationship exception consists of a two-prong analysis.  [Citation.]  The first prong inquires whether there has been regular visitation and contact between the parent and child.  [Citation.]  The second asks whether there is a sufficiently strong bond between the parent and child that the child would suffer detriment from its termination.  [Citation.] [¶] The first prong is quantitative and relatively straightforward, asking whether visitation occurred regularly and often. [Citation.] [¶]  In contrast, the second prong involves a qualitative, more nuanced analysis, and cannot be assessed by merely looking at whether an event, i.e. visitation, occurred. Rather, the second prong requires a parent to prove that the bond

17

between the parent and child is sufficiently strong that the child would suffer detriment from its termination.  [Citation.]  In applying this exception, the court must take into account numerous variables, including but not limited to (1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the "'positive'" or "'negative'" effect of interaction between parent and child, and (4) the child's unique needs." (*In re Grace P.* (2017) 8 Cal.App.5th 605, 612-613.)

"The [parent] has the burden of proving [his or] her relationship with the children would outweigh the well-being they would gain in a permanent home with an adoptive parent. [Citations.]  Evidence of frequent and loving contact is not enough to establish a beneficial parental relationship. [Citations.]  The [parent] also must show [he or] she occupies a parental role in the children's lives."  (*In re Noah G.*, *supra*, 247 Cal.App.4th at p. 1300; see *In re K.P.* (2012) 203 Cal.App.4th 614, 621 ["[n]o matter how loving and frequent the contact, and notwithstanding the existence of an 'emotional bond' with the child, 'the parents must show that they occupy "a parental role" in the child's life'"]; *In re C.F.* (2011) 193 Cal.App.4th 549, 557 ["'[w]here a biological parent . . . is incapable of functioning in that role, the child should be given every opportunity to bond with an individual who will assume the role of a parent'"]; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 577 [severing the relationship between the parent and the child was not "detrimental to [the child] because the relationship was one of friends, not of parent and child"].)

"Parents can request a contested hearing . . . to present evidence supporting their claim that an exception to termination of parental rights exists."  (*In re Grace P.*, *supra*, 8 Cal.App.5th at

18

p. 611.)  "A parent has a right to due process at a section 366.26 hearing resulting in the termination of parental rights, which includes a meaningful opportunity to be heard, present evidence, and confront witnesses.  However, these procedural rights are subject to evidentiary principles. . . . Since due process does not authorize a parent 'to introduce irrelevant evidence, due process does not require a court to hold a contested hearing if it is not convinced the parent will present relevant evidence on the issue he or she seeks to contest.' . . . The parent's offer of proof 'must be specific, setting forth the actual evidence to be produced, not merely the facts or issues to be addressed and argued.'"  (*Id.* at pp. 611-612; see *In re A.G.* (2020) 58 Cal.App.5th 973, 1006 ["a parent asserting an exception to adoption at a 366.26 hearing is not automatically entitled to a hearing, and the juvenile court may require him or her to make an offer of proof demonstrating that the parent will present specific evidence to support the claimed exception"]; *M.T. v. Superior Court* (2009) 178 Cal.App.4th 1170, 1180 [offer of proof permissible at section 366.26 hearing because parent had burden to show applicability of an exception to termination of parental rights]; *In re Thomas R.* (2006) 145 Cal.App.4th 726, 732 ["[p]recluding the parents from exploring and testing the sufficiency of the Department's evidence is fundamentally different than requiring them to describe evidence they will offer to prove a point"]; *In re Tamika T.* (2002) 97 Cal.App.4th 1114, 1122 [the "due process right to present evidence is limited to relevant evidence of significant probative value to the issue before the court" (italics omitted)].)

We review the juvenile court's denial of a contested hearing for abuse of discretion.  (*In re Grace P., supra,* 8 Cal.App.5th at

19

p. 611; *In re A.B.* (2014) 230 Cal.App.4th 1420, 1434; *Ingrid E. v. Superior Court* (1999) 75 Cal.App.4th 751, 758-759.)

2.    <em>The Juvenile Court Did Not Abuse Its<br>Discretion in Denying a Contested Hearing</em>

David contends the juvenile court abused its discretion by denying his request for a contested hearing on the application of the beneficial parental relationship exception under section 366.26, subdivision (c)(1)(B)(i). The Department contends that David's "offer of proof was insufficient to warrant a contested hearing." The juvenile court reasonably concluded that David's offer of proof was deficient.

The juvenile court detained Josiah from David and ordered David's visitation with Josiah to be monitored at the Department's office. After the criminal court issued a 10-year restraining order against David protecting Maria in November 2015, David went to jail in part because he violated the restraining order in July 2017. Nonetheless, David argues that he "continued to see" Josiah while David "*was living*" with Maria, "[t]hough this was not how [David] was supposed to have contact with Josiah." However, aside from David's violations of court orders, David's offer of proof failed to mention that he had lived with Maria and Josiah. Thus, David's offer of proof did not set forth actual evidence as to how long David claimed that he lived with Josiah, how often David saw Josiah given David's work schedule, or any other information regarding their time together. Further, other than several brief references in the Department's reports that Maria had allowed David "access to Josiah" in her home, there was no information regarding David's contact with Josiah in Maria's home. The evidence established that, from November 28, 2017 to the October 2019 section 366.26 hearing,

David visited Josiah four times; with his last visit on July 12, 2018.

In his offer of proof, David did not set forth evidence that he had maintained regular visitation and contact with Josiah. Rather, David sought to explain why he had not visited Josiah at least since February 1, 2019 when the Department removed Josiah from Maria's home and placed him with Cristal and Emmanuel. David did not explain why he was dealing with Cristal to arrange visits and not following the juvenile court's order for monitored visitation at the Department's office. In July 2019, when the Department reported that David "agreed" to call the social worker "to schedule his visits," David did not mention that there was any impediment to his visitation. Because David failed to state with specificity the evidence he would produce in a contested hearing to meet the first requirement of the beneficial parent-child relationship exception, the juvenile court did not abuse its discretion in denying David's request for a contested hearing. (*In re A.G., supra,* 58 Cal.App.5th at p. 1010 ["[a] parent's failure to set forth specific evidence, especially with a record negating the parent's regular visitation of the minor, will justify the denial of a hearing"]; see *In re Breanna S.* (2017) 8 Cal.App.5th 636, 647 [juvenile court's decision may be based on "any or all of the component determinations" of the beneficial parent-child relationship]; *In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643 ["'[s]pordic visitation is insufficient'"].)

Further, David's offer of proof did not include evidence on the strength of his bond with Josiah, the kind of role he assumed in his life (as a parent, friend, or otherwise), whether Josiah considered David his father, or how Josiah would suffer if the juvenile court terminated David's parental rights. David's vague

21

and general reference to Josiah's "best interests" gave no information about any impact of termination of David's parental rights on Josiah. The same is true for the statement that David had "certificates of completion." (*In re A.G., supra,* 58 Cal.App.5th at p. 1006 ["[i]t may be readily concluded that, for example, an offer of proof containing the assertion of the fact that the parent had a close parent-child bond with the minor–without identification of a witness or witnesses who would so testify to that fact–would not be sufficient"]; see *In re Tamika T., supra,* 97 Cal.App.4th at p. 1124 ["[t]he offer of proof must be specific, setting forth the actual evidence to be produced"]; cf. *In re Grace P., supra,* 8 Cal.App.5th at p. 614 [father's offer of proof was sufficient where he represented that he would testify "about the positive quality of his visitation, how he parented all three children during visits," and how "the children considered him to be a father figure" and that his daughter would testify "regarding how she enjoyed visits with [him], saw [him] as a parent, and would be sad if visitation with [him] ended"].)

Because he had the burden of proving the parent-child relationship exception applied, David was obligated to state with specificity the evidence he would produce in a contested hearing. (*In re A.G., supra,* 58 Cal.App.5th at p. 996 ["[t]he burden is on the parent asserting the parental relationship exception to produce evidence establishing that exception"]; *In re Grace P., supra,* 8 Cal.App.5th at p. 611 ["[i]f the parents have failed to reunify and the court has found the child likely to be adopted, the burden shifts to the parents to show exceptional circumstances exist such that termination would be detrimental to the child"]; *In re Breanna S., supra,* 8 Cal.App.5th at p. 646 ["[t]he parent has the burden of proving the statutory exception applies"];

22

*In re K.P.*, *supra*, 203 Cal.App.4th at p. 621 [same]; see *In re Cristella C.* (1992) 6 Cal.App.4th 1363, 1372-1373 ["[u]nder [section 366.26] there is no requirement that an absence of benefit from continuing the [parent-child] relationship be proved as an element of termination"].)

The juvenile court acted within its discretion in denying David's request for a contested section 366.26 hearing. (See generally *In re Stephanie M.* (1994) 7 Cal.4th 295, 317 ["[i]n any custody determination, a primary consideration in determining the child's best interests is the goal of assuring stability and continuity"]; *In re Marilyn H.* (1993) 5 Cal.4th 295, 307 [once reunification efforts have been found unsuccessful, the court then must "concentrate its efforts . . . on the child's placement and well-being, rather than on a parent's challenge to a custody order"]; *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 250, 259 [when the child is adoptable and declining to apply one of the statutory exceptions would not cause detriment to the child, the decision to terminate parental rights is "'relatively automatic'"].)

### C. Substantial Evidence Supported the Juvenile Court's ICWA Findings as to Karina

#### 1. Applicable Law

##### a. ICWA inquiry requirements

"ICWA established minimum standards for state courts to follow before removing Indian children from their families and placing them in foster care or adoptive homes." (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1048.) Under ICWA and the California law implementing it, "'Indian child' means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C.

23

§ 1903(4); see § 224.1, subd. (a) [adopting the federal definition]; *In re D.S.*, at p. 1048 ["[a]n 'Indian child' is defined in the same manner [under California law] as under federal law"].)

"ICWA itself does not impose a duty on courts or child welfare agencies to inquire as to whether a child in a dependency proceeding is an Indian child. [Citation.] Federal regulations implementing ICWA, however, require that state courts 'ask each participant in an emergency or voluntary or involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child.' [Citation.] The court must also 'instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child.'" (*In re Austin J.* (2020) 47 Cal.App.5th 870, 882-883; see 25 C.F.R. § 23.107(a).)

In addition, "ICWA provides that states may provide 'a higher standard of protection to the rights of the parent or Indian custodian of an Indian child than the rights provided under' ICWA. (25 U.S.C. § 1921.) Under California law, the court and county child welfare department 'have an affirmative and continuing duty to inquire whether a child,' who is the subject of a juvenile dependency petition, 'is or may be an Indian child.' (§ 224.2, subd. (a); see . . . Cal. Rules of Court, rule 5.481(a).) The child welfare department's initial duty of inquiry includes 'asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled.' (§ 224.2, subd. (b).)" (*In re Austin J.*, *supra*, 47 Cal.App.5th at p. 883; accord, *In re T.G.* (2020) 58 Cal.App.5th 275; *In re D.F.* (2020) 55 Cal.App.5th 558,

24

566; *In re D.S., supra,* 46 Cal.App.5th at p. 1049.)[5]

"California law also requires 'further inquiry regarding the possible Indian status of the child' when 'the court, social worker, or probation officer has reason to believe that an Indian child is involved [or, under Cal. Rules of Court, rule 5.481(a)(4), "may be involved"] in a proceeding. . . . ' (§ 224.2, subd. (e).")  (*In re Austin J., supra,* 47 Cal.App.5th at p. 883.)  Former section 224.2, subdivision (e), which is applicable to this appeal, did not define "reason to believe."  (*In re Austin J.,* at p. 883 [the "Legislature, which added the 'reason to believe' threshold for making a further inquiry in 2018, [had] not define[d] the phrase"].)[6]  "When

_____

[5]     Effective January 1, 2019, the Legislature repealed sections 224.2 and 224.3 and enacted new versions of those statutes. (Assem. Bill No. 3176 (2017-2018 Reg. Sess.); Stats. 2018, ch. 833, §§ 5, 7.)  Although the juvenile court made the ICWA findings regarding Karina in May 2018, the law in effect in October 2019 when the section 366.26 hearings were held applies to this appeal.  (See *In re A.M.* (2020) 47 Cal.App.5th 303, 321 ["[s]ince Mother is appealing from the findings made at the September 6, 2019 section 366.26 hearing and not those in 2017 or 2018, the current ICWA statutes apply"]; see also *Isaiah W.* (2016) 1 Cal.5th 1, 10 ["Properly understood, Ashlee's present appeal does not seek to challenge the juvenile court's finding of ICWA's inapplicability underlying the January 2012 dispositional order.  It instead seeks to challenge the juvenile court's finding of ICWA's inapplicability underlying the April 2013 order terminating her parental rights"].)

[6]     The Legislature, however, has since amended section 224.2, subdivision (e), effective September 18, 2020, to provide a definition.  (Assem. Bill No. 2944 (2019-2020 Reg. Sess.); Stats. 2020, ch. 104, § 15.)  As amended, the statute now provides: "There is reason to believe a child involved in a proceeding is an Indian child whenever the court, social worker, or probation

25

that ['reason to believe'] threshold is reached, the requisite 'further inquiry' 'includes: (1) interviewing the parents and extended family members; (2) contacting the Bureau of Indian Affairs and State Department of Social Services; and (3) contacting tribes the child may be affiliated with, and anyone else, that might have information regarding the child's membership or eligibility in a tribe.'" (*Ibid.*; see § 224.2, subds. (e)(2)(A)-(C); former § 224.2, subds. (e)(1)-(3).) "Contact with a tribe shall, at a minimum, include telephone, facsimile, or electronic mail contact to each tribe's designated agent for receipt of notices under" ICWA and "shall include sharing information identified by the tribe as necessary for the tribe to make a membership or eligibility determination, as well as information on the current status of the child and the case." (§ 224.2, subd. (e)(2)(C); see former § 224.2, subd. (e)(3)). Notably, "[t]he sharing of information with tribes at this inquiry stage is distinct

---

officer has information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe. Information suggesting membership or eligibility for membership includes, but is not limited to, information that indicates, but does not establish, the existence of one or more of the grounds for reason to know [that a child is an Indian child] enumerated in paragraphs (1) to (6), inclusive, of subdivision (d)." (§ 224.2, subd.(e)(1).) Effective January 1, 2020, California Rules of Court, rule 5.481(a)(4), now provides: "If the social worker . . . or petitioner knows or has reason to know *or believe* that an Indian child is or may be involved, that person or entity must make further inquiry as soon as practicable . . . ." (Emphasis added.) Notwithstanding these amendments, we refer in our opinion to section 242, subdivision (e), and California Rules of Court, rule 5.481(a)(4) as they read in October 2019 when the section 366.26 hearing took place.

from formal ICWA notice, which requires a 'reason to know'—rather than a 'reason to believe'—that the child is an Indian child." (*In re D.S.*, *supra*, 46 Cal.App.5th at p. 1049.)

b. *ICWA notice requirements*

"In addition to the inquiry that is required in every dependency case from the outset and the 'further inquiry' required under California law when there is a 'reason to believe' an Indian child is [or may be] involved, a third step—notice to Indian tribes—is required under ICWA and California law if and when 'the court knows or has reason to know that an Indian child is involved.'" (*In re Austin J.*, *supra*, 47 Cal.App.5th at pp. 883-884; see 25 U.S.C. § 1912(a); § 224.3, subd. (a); Cal. Rules of Court, rule 5.481(b)(1); see also *In re D.S.*, *supra*, 46 Cal.App.5th at p. 1050 ["If the inquiry establishes a reason to know an Indian child is involved, notice must be provided to the pertinent tribes."].)

A "'reason to know' exists under any of the following circumstances: '(1) A person having an interest in the child, including the child, an officer of the court, a tribe, an Indian organization, a public or private agency, or a member of the child's extended family informs the court that the child is an Indian child[;] [¶] (2) The residence or domicile of the child, the child's parents, or Indian custodian is on a reservation or in an Alaska Native village[;] [¶] (3) Any participant in the proceeding, officer of the court, Indian tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child[;] [¶] (4) The child who is the subject of the proceeding gives the court reason to know [he or she] is an Indian child[;] [¶] (5) The court is informed that the child is or has been a ward of a tribal court[;] and [¶] (6) The

27

court is informed that either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe.' (§ 224.2, subd. (d).)" (*In re D.S.*, *supra*, 46 Cal.App.5th at pp. 1049-1050.)

Notice to a tribe "must include enough information for the tribe to 'conduct a meaningful review of its records to determine the child's eligibility for membership.'" (*In re D.S.*, *supra*, 46 Cal.App.5th at p. 1050; see *In re Cheyanne F.* (2008) 164 Cal.App.4th 571, 576 ["[t]he purpose of the ICWA notice provisions is to enable the tribe or the [Bureau of Indian Affairs] to investigate and determine whether the child is in fact an Indian child"].) This includes providing "identifying information for the child's biological parents, grandparents, and great-grandparents, to the extent known." (*In re D.S.*, at p. 1050; see § 224.3, subd. (a)(5)(C).) "A determination by an Indian tribe that a child is or is not a member of, or eligible for membership in, that tribe . . . shall be conclusive." (§ 224.2, subd. (h).)

To summarize: An initial "duty of inquiry applies to every 'child for whom a petition under Section 300, 601, or 602 may be or has been filed' (§ 224.2, subd. (a))," the "duty of further inquiry applies when there is a 'reason to believe that an Indian child is involved [or, under Cal. Rules of Court, rule 5.481(a)(4), "may be involved"] in a proceeding' (§ 224.2, subd. (e))," and "the duty to provide notice to Indian tribes applies only when one knows or has a 'reason to know . . . an Indian child is involved.'" (*In re Austin J.*, *supra*, 47 Cal.App.5th at p. 884; see *In re M.W.* (2020) 49 Cal.App.5th 1034, 1047 ["a 'reason to believe' the minor is an Indian child triggers requirements less rigorous than does a 'reason to know'"].)

### 2. *Standard of Review*

Where, as here, the juvenile court finds ICWA does not apply to a child,[7] "[t]he finding implies that . . . social workers and the court did not know or have a reason to know the children were Indian children and that social workers had fulfilled their duty of inquiry." (*In re Austin J.*, *supra*, 47 Cal.App.5th at p. 885; see *In re D.S.*, *supra*, 46 Cal.App.5th at p. 1050 ["[t]he juvenile court may . . . make a finding that ICWA does *not* apply because the Agency's further inquiry and due diligence was 'proper and adequate' but no 'reason to know' whether the child is an Indian child was discovered"].) "We review a court's ICWA findings for substantial evidence. [Citations.] 'We must uphold the court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them, and we resolve all conflicts in favor of affirmance.'" (*In re Austin J.*, at p. 885.) The appellant "'has the burden to show that the evidence was not sufficient to support the findings and orders.'" (*Ibid.*)

### 3. *Substantial Evidence Supported the Juvenile Court's ICWA Finding*

David argues, "Despite the duty of continuing inquiry, [the Department] did not inquire about [Karina's] ancestry" when Karina "appeared" to file her section 388 petition. David also argues that the "[Department] continued to cite the [incorrect] July [2018] hearing as resolving the issue."

---

**7** We construe the juvenile court's finding at the May 2018 hearing it did "not have a reason to know" Josiah was an Indian child as a finding ICWA did not apply. (See *In re D.S.*, *supra*, 46 Cal.App.5th at p. 1050.)

David's argument that the Department failed to inquire when Karina appeared to file the section 388 petition in December 2018 is incorrect. The Department's due diligence efforts included inquiry regarding the address and telephone number Karina listed on her section 388 petition. The Department spoke with the mother of Karina's former boyfriend, who resided at the address Karina provided. The former boyfriend's mother stated that, when Karina and her son "separated[, Karina] moved out of her house and has not been back since." In addition, the Department twice called the telephone number Karina listed on her section 388 petition and left voicemail messages "requesting a call back." Further, although David characterizes Karina as "appear[ing]" when she filed her petition, there was no appearance because the juvenile court denied Karina's petition without a hearing. Karina did not attend a hearing in court. David fails to identify what else the Department could have done to locate Karina or further investigate her possible Indian ancestry.

During its investigation, the Department located a document from the prior dependency proceedings indicating that Karina "may have Navajo [ancestry]," and Maria told the Department that Karina's "children may have Indian [ancestry]." To the extent that this information constituted "reason to believe that an Indian child is [or may be] involved," the Department conducted an adequate and proper "further inquiry" under section 224.2, subdivision (e). (See *In re T.G., supra*, 58 Cal.App.5th at p. 295 ["[a]dditional investigation may not develop further information establishing the need for ICWA notice, but it is essential to the enforcement of the court's and child protective agency's 'affirmative and continuing duty to inquire' to construe

30

broadly the duty to make further inquiry]; *In re M.W., supra,* 49 Cal.App.5th at p. 1044 [father's statement he may have Indian ancestry even though he could not identify the tribe, "trigger[ed] the provisions of section 224.2, subdivision (e), which required the court and the Department to make further inquiry as soon as practicable"]; *In re D.S., supra*, 46 Cal.App.5th at p. 1052 [aunt's statement of possible Indian ancestry established a reason to believe the child was an Indian child and triggered a duty of further inquiry].)

In addition to its extensive search for Karina, the Department attempted to contact Karina's parents using their last known contact information and searched databases for updated contact information. Despite its efforts, the Department could not locate Karina's relatives. The Department also interviewed David, and Cristal, who adopted three of Karina's children. David stated that Karina did not have Indian ancestry. Cristal had no relevant information. In accordance with section 224.2, subdivision (e), the Department sent the ICWA-030 form via certified mail to three Navajo tribes, three Regional Directors of the Bureau of Indian Affairs, and the Secretary of the Interior, none responded that Karina had Indian ancestry or that Josiah was an Indian child. The Department also learned that Karina, in the prior dependency proceedings involving Josiah's siblings, denied she had Indian ancestry, and the juvenile court found ICWA did not apply. In addition to reporting the results of its investigation to the juvenile court, the Department filed the notices, the receipts of notice and the responsive letters in court before the juvenile court made its May 2018 ICWA determination

as to Karina.[8]  To the extent required, the Department conducted an adequate and proper "further inquiry" under section 224.2, subdivision (e).  (See *In re D.F., supra,* 55 Cal.App.5th at p. 570 ["[b]ased on the record before us, we find [the Department] made a good faith effort to gather information about the children's membership status or eligibility.  [The Department's] inquiry obligation is 'not an absolute duty to ascertain or refute Native American ancestry'"]; *In re D.S., supra,* 46 Cal.App.5th at p. 1054 ["the Agency followed the proper procedures in conducting its further inquiry, but the limited information provided by Aunt was too attenuated for the Agency to do anything further"].)

Substantial evidence supported the juvenile court's findings that there was "no reason to know" that Josiah was an Indian child and that ICWA did not apply.  (*In re D.F., supra,* 55 Cal.App.5th at pp. 571-572 ["DCFS's further inquiry did not result in a *reason to know* the children are Indian children.  We conclude the court's finding that ICWA does not apply to the children is supported by substantial evidence"]; *In re M.W., supra,* 49 Cal.App.5th at p. 1048 ["[t]he Department satisfied the criteria set forth in section 224.2, subdivision (e) and the juvenile court's finding that, based on the evidence provided, there was no reason to know the minor was an Indian child and no further noticing was required, and its determination that the ICWA did not apply were supported by substantial evidence"].)

---

[8]    The Department's incorrect references in its reports that the juvenile court made this finding in July 2018 were irrelevant because the juvenile court had the results of the Department's ICWA investigation at the May 2018 hearing.

32

**DISPOSITION**

The juvenile court's October 17, 2019 order is affirmed.


DILLON, J.*


We concur:


PERLUSS, P. J.


SEGAL, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.